UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **Thomas E. Minogue,** | ) | **CASE NO. 1:06-cv-286** |
| **Herman H. Tarnow, and** | ) | |
| **Jane F. Sims,** | ) | |
|     **Co-Trustees of the Phyllis** | ) | |
|     **Andrews Family Trust** | ) | |
| | ) | |
|         **Plaintiffs,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
|    **Vs.** | ) | |
| | ) | **Memorandum of Opinion and Order** |
| **Arthur B. Modell** | ) | |
|         **Defendant.** | ) | |

**INTRODUCTION**

This matter is before the Court upon Plaintiffs' Motion for a Preliminary Injunction, filed before removal from State court. This case relates to Defendant Arthur Modell's failure to pay a finder's fee upon the alleged divestment of his stock interest in the company that owned the former Cleveland Browns football team. For the following reasons, Plaintiffs' Motion is DENIED.

1

**FACTS**

Plaintiffs Thomas E. Minogue, Herman H. Tarnow and Jane F. Sims, Co-Trustees of the Phyllis Andrews Family Trust ("Trustees"), filed a Complaint and this Motion in the Cuyahoga County Court of Common Pleas on December 30, 2005.  The matter was removed to this Court on the basis of diversity of citizenship on February 6, 2006.

In their Complaint, the Trustees allege the following facts.  In 1960, Vincent Andrews introduced Defendant Modell to an individual seeking a buyer for the Cleveland Browns football team.  (Comp. ¶ 26).  This introduction eventually resulted in the sale of the team to Defendant and a partner.  (Comp. ¶ 27-29).  Prior to the time that the purchase agreement was finalized, Andrews agreed to release Defendant from any obligation to a finder's fee.  (Comp. ¶ 39). Defendant eventually completed the sale and created the entity Cleveland Browns, Inc. ("CBI") (Comp. ¶ 33).

Following the completion of the sale, Defendant and Andrews entered into a Letter Agreement.  Some relevant terms of the Agreement read as follows:

> 1. You [Modell] hereby retain me [Andrews] as your business manager for the period commencing January 1, 1963 and ending December 31, 1970.  You will pay me a compensation of $3,000 for each of the calender years during that period . . . .  In consideration of such retainer, I shall render to you at reasonable times and places such business advice, including the preparation of federal and other income and similar tax returns, as you may request.
>
> 2.  In addition to the foregoing, and as a finder's fee payable to me as a result of my efforts in the negotiations and transactions leading to your ownership of stock in Cleveland Browns, Inc., a Delaware corporation ("Browns"), and the acquisition by that corporation on March 22, 1961, of substantially all the assets of Cleveland Browns, Inc., an Ohio corporation, you agree that when, as and if you ever completely divest yourself of all your stock interest in the Browns or the Browns completely liquidate, you shall pay me an amount equivalent to 5% of your net gain from either of those transactions and any intervening sales by you of your Browns stock.

> \* \* \*
>
> [3.] However, the payments specified in Section 2 above shall be made in the event of my death to my estate.

(Comp. Ex. 15). Mr. Andrews died on January 2, 1969, naming his widow Phyllis as the executrix of his estate and his sole legatee.  (Comp. ¶ 40).

Defendant eventually acquired a majority of CBI's shares and moved the team to Baltimore in 1996. (Comp. ¶ 41-42). By 1997 he had acquired 100% of the Baltimore franchise, by then renamed the Baltimore Ravens. (Comp. ¶ 43). In December of 1999 it was announced that Defendant and Baltimore businessman Stephen Bisciotti had agreed to a sale of at least some portion of the Ravens franchise, which was then held by an entity called BRLP . (Comp. ¶ 45, 48). The terms of the agreement allowed Bisciotti's Baltimore Football Company ("BFC") to purchase 49% of the team immediately with an option to purchase the remaining 51% by December 1, 2005. (Comp. ¶ 50). Soon thereafter, Phillis Andrews created the Andrews Family Trust ("Trust") and entered into a Purchase Agreement in which she purported to transfer her interest in the Letter Agreement to the Trust. (Comp. ¶ 51-52).

Bisciotti announced his intention to exercise his purchase option in the Spring of 2003. (Comp. ¶ 54). He also offered to allow Defendant to retain ownership of up to 20% of the team, an offer which Defendant initially declined.  (Comp. ¶ 55). Soon after Bisciotti's announcement, representatives of Mrs. Andrews and the Trust sought information about the sale from Defendant.  (Comp. ¶ 55). When the desired responses were not forthcoming, the original trustees (current trustee Minogue and former trustee Thomas O. Callaghan) filed a complaint in the Cuyahoga County Court of Common Pleas on May 23, 2003.  That action was removed to

this Court on June 25, 2003. The Court thereafter transferred the case to the United States District Court for the District of Maryland.

In the summer of 2003, while the original action was pending, Defendant signaled his desire to retain a 1% ownership interest in the team. (Comp. ¶ 56-57). However, the transaction went forward as originally planned for a number of months until, on April 8, 2004, Bisciotti and Defendant altered their agreement. (Comp. ¶ 58-60). Under the revised agreement, Nevermore LLC ("Nevermore") was allowed to retain 1% of the stock in BRLP. (Comp. ¶ 60). Nevermore, in turn, is 99% owned by Baltimore Ravens, Inc. ("BRI") and 1% owned by MSLP, Inc. (Comp. ¶ 61). Defendant owns 100% of BRI and 65% of MSLP, while his wife owns the remaining 35% of MSLP. *Id*.

Nevermore's 1% interest is subject to a number of restrictions. First, it is subject to puts and calls which serve to protect both Defendant and Bisciotti by keeping the price of Nevermore's share at or near the current price. (Comp. ¶ 68). Second, limitations are placed on Nevermore's ability to transfer its interest in BRLP, the ability of BRI and MSLP to transfer their interests in Nevermore, and the ability of the individual shareholders to transfer their interests in BRI and MSLP. *Id.* Finally, an irrevocable proxy granted Nevermore's voting rights in BRLP to BFC. (Comp. ¶ 69).

In the meantime, litigation was moving forward in the District of Maryland. In the original complaint, the plaintiffs alleged breach of contract and sought an accounting. Defendant filed three motions for summary judgment. The first alleged that the Trust lacked standing to enforce the Letter Agreement because it had never been transferred from Mr. Andrews's estate. The second motion argued that the finder's fee portion of the Letter Agreement was

4

unenforceable because the consideration (finding the opportunity to purchase the Browns) had already occurred when the Letter Agreement was signed. The third motion argued that the triggering event—"when, as and if you ever completely divest yourself of all your stock interest in the Browns or the Browns completely liquidate"—never occurred.

The district court first found that the Trust did not have standing. Mrs. Andrews's letter purporting to transfer the Letter Agreement was not sworn and was contradicted by her deposition testimony. *Minogue v. Modell*, 384 F.Supp.2d 821, 824-25 (D. Md. 2005) ("*Minogue I*"). The Letter Agreement could not have passed to her by operation of law because the estate was insolvent and not finally closed. *Id*. at 825. Because they could not prove that Mrs. Andrews ever had any rights to the Letter Agreement, plaintiffs also could not prove that she transferred it to the Trust. *Id*. Thus, summary judgment in Defendant's favor was proper.

The court also addressed the parties' remaining disputes. Regarding Defendant's claim of a lack of consideration, the court found a genuine issue of material fact as to whether the finder's fee was in exchange for the previous act of locating the team or Andrews's later work as Defendant's business agent. *Id*. at 825. The court also found a genuine issue of material fact as to whether Defendant's remaining 1% interest satisfied the triggering event. *Id*. Finally, the court also discussed and rejected the plaintiffs' claim that the doctrine of prevention applied in this case. *Id.* at 826.

The Trust then attempted to cure its standing problems. Documents which bear a caption of the Nassau County, New York, Surrogate's Court were executed by Mrs. Andrews on September 19, 2005. (Comp. ¶ 80, Ex. 8). Those documents were intended to reconfirm the transfer of the Letter Agreement from her husband's estate to her and from her to the Trust.

(Comp. ¶ 80, Ex. 8).  Defendant counters that filings in the Surrogate's Court have been monitored and no such documents have been filed with the Surrogate's Court.  (Def's Ex. 1).

This suit was filed on December 30, 2005.  The Complaint includes the following six counts: 1) Breach of Contract; 2) Violation of the Common Law Doctrine of Prevention; 3) Breach of the Implied Covenant of Good Faith and Fair Dealing; 4) Equitable Lien and Constructive Trust; 5) Preliminary Injunction; and 6) Accounting.

At issue here is Plaintiffs' Motion for a Preliminary Injunction.  Plaintiffs' Complaint alleges that Defendant has acknowledged the validity of the Letter Agreement, yet has stated his intent not to make any payments under it.  (Comp. ¶ 105-06).  Defendant has engaged in extensive estate planning activities such that some of his assets have already been transferred to others.  (Comp. ¶ 107).  He also refuses to set any assets aside to satisfy a potential judgment.  (Comp. ¶ 109).  Thus, "Plaintiffs reasonably expect that Modell will transfer the remainder of his assets to others unless immediate injunctive relief is granted to prevent such wrongful acts."  (Comp. ¶ 108).  They seek an Order that "Modell retains in his possession or his estate's possession unencumbered assets sufficient to eventually pay the finder's fee, which Plaintiffs estimate to be not less than $21.5 million, with the exact amount to be determined by this Court."  (Comp. ¶ 110).

**STANDARD OF REVIEW**

"'[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'"  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A C. Wright *et al.*, *Federal Practice and Procedure* § 2948, pp. 129-130 (2d ed. 1995))(emphasis added in original).  Thus, "the proof

required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion." *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000).

"When considering a motion for a preliminary injunction, the district court should consider four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *Rock and Roll Hall of Fame and Museum, Inc. v. Gentile Productions*, 134 F.3d 749, 753 (6th Cir. 1998); *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

A district court must make specific findings concerning each of these factors, unless analysis of fewer factors is dispositive of the issue. *Six Clinics Holding Corp., II v. Cafcomp Systems, Inc.*, 119 F.3d 393, 399 (6th Cir. 1997). However, not all of the factors need to be fully established for an injunction to be proper. *Michigan State AFL-CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997). Instead, the factors should be balanced. *Connection Distributing Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998). While no single factor is given controlling weight, a preliminary injunction should not be issued where there is no likelihood of success on the merits. *Michigan State AFL-CIO*, 103 F.3d at 1249. Where the court concludes that there is no likelihood of success on the merits, it need not address the other three factors. *Id*.

**DISCUSSION**

Prior to addressing the preliminary injunction factors, the Court must first consider the holding of *Grupo Mexicano De Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308

(1999).  In *Grupo Mexicano*, the defendant was a Mexican holding company that issued $250 million in notes, $75 million of which were purchased by a number of American investment funds.  *Id*. at 310.  The defendant soon encountered financial difficulties and stopped paying interest on the notes.  At the same time, the defendant was busy distributing its assets to Mexican creditors, even though its SEC filings indicated that current liabilities exceeded current assets and that there was "substantial doubt" whether it could continue as a going concern.  *Id*.  The plaintiffs accelerated the principal on the notes and filed suit for breach of contract in federal district court.  *Id*. at 312.  Because the defendant was nearly insolvent and quickly dissipating its assets, the plaintiffs sought a preliminary injunction restraining the defendant from distributing its assets.  *Id*.  The district court granted the preliminary injunction, holding that "in light of the [defendant's] financial condition and dissipation of assets, any judgment [plaintiffs] obtain in this action will be frustrated."  *Id*.

The Supreme Court reversed.  The central inquiry was "whether the relief requested here was traditionally accorded by courts of equity."  *Id*. at 319.  The Supreme Court ultimately concluded that "[b]ecause such a remedy was historically unavailable from a court of equity, we hold that the District Court had no authority to issue a preliminary injunction preventing petitioners from disposing of their assets pending adjudication of respondents' contract claim for money damages."  *Id*. at 333.  "[T]here is absolutely nothing new about debtors' trying to avoid paying their debts, or seeking to favor some creditors over others – or even about their seeking to achieve these ends through 'sophisticated . . . strategies[.]'  The law of fraudulent conveyances and bankruptcy was developed to prevent such conduct; an equitable power to restrict a debtor's use of his unencumbered property before judgment was not."  *Id*. at 322.

Defendant argues, and Plaintiffs essentially concede,[1] that *Grupo Mexicano* bars a preliminary injunction under the counts of breach of contract, prevention and breach of the duty of good faith and fair dealing.  All three of these claims seek purely monetary damages rather than equitable relief.  Thus, the only count at issue is Plaintiffs' count 4 of Equitable Lien and Constructive Trust.  That claim assumes an obligation under the contract (*see* Comp. ¶ 98) and continues as follows: "Modell and Andrews implicitly intended that Modell's stock interest in the Cleveland Browns and any proceeds received by Modell as a consequence of its partial or complete sale would serve as security for the payment of the finder's fee obligation."  (Comp. ¶ 99).

Defendant first argues that the equitable lien or constructive trust sought by the Plaintiffs is not the type of equitable relief which is appropriate for a preliminary injunction.  They cite *Mitsubishi Int'l Corp. v. Cardinal Textile Sales, Inc.* for the proposition that a constructive trust over funds is not available when there is an adequate damage remedy under law.  14 F.3d 1507, 1518 (11th Cir. 1994).  However, that case merely addressed the availability of a constructive trust under Georgia law.  *Id*. at 1518, 1523.  The majority held that a preliminary injunction was unavailable only after it concluded that Georgia law did not support a constructive trust on the

---

[1]  At page five of Plaintiffs' Reply brief, they cite to *QSI-Fostoria DC, LLC v. Gen. Elec. Capital Bus. Asset Funding Corp.*, No. 02-cv-7466, 2004 WL 81902 (N.D. Ohio Jan. 14, 2005).  The Plaintiffs quote a passage from *QSI-Fostoria* wherein the district court held that damage claims could not serve as the basis for a preliminary injunction, but that equitable claims could.  *Id*. at *4.  The Plaintiffs conclude as follows: "Similarly, in this case, Plaintiffs have stated a claim for equitable relief (i.e., Count 4 for Equitable Lien and Constructive Trust) that affords the Court a basis for the preliminary injunction Plaintiffs seek."

facts. *Id*. at 1520-21 (stripping the claim of the "rhetoric of . . . constructive trusts" and addressing the dispute as an attachment issue).  The dissent, after reaching the opposite conclusion (that Georgia law would allow the constructive trust) opined that a preliminary injunction would be proper. *Id*. at 1525-26.  As Plaintiffs note, the dissent relied upon a Sixth Circuit case, *USACO Coal Co. v. Carbonmin Energy, Inc.,* 689 F2d 94, 97 (6th Cir. 1982).  That case allowed an injunction to preserve "assets for which defendants may be accountable under a constructive trust." *Id.* at 98.

Although the Court might have the power to grant such an injunction, it still must determine whether a preliminary injunction is appropriate. The first issue is whether the movant has a strong likelihood of success on the merits.  Plaintiffs' constructive trust claim presumes the existence of an obligation, which would have to arise from the Letter Agreement.  (Compl. ¶ 98); *see also Landskroner v. Landskroner*, 797 N.E.2d 1002, 1014 (Ohio App. 8th Dist. 2003) (holding that an equitable lien requires an obligation).  In other words, even though counts one through three cannot be the basis for a preliminary injunction, a likelihood of success on one of those theories is a prerequisite for recovery under Plaintiffs' equitable lien and constructive trust theory.

The Court's analysis of these claims is informed by the decision in *Minogue I*, which was rendered after the completion of discovery in that action.  First, *Minogue I* held that the original trustees did not have standing.  Plaintiffs counter that they cured the errors identified in *Minogue I*.  The *Minogue I* court found the original transfer agreement insufficient, in part, because it "was not sworn to by Mrs. Andrews."  384 F.Supp.2d at 825.  A sworn, witnessed and notarized document is attached to Plaintiffs' latest Complaint as Exhibit 8.  Defendant responds that even

10

this revised document is insufficient to confer standing. He notes that no activity has been logged with the Surrogate's Court. Nonetheless, Defendant has not identified how this is required under New York law.[2]

Defendant makes stronger points regarding the merits of the contract claim. First, the Letter Agreement was entered into after Defendant purchased his interest in the Browns. This raises serious issues of whether there was consideration for the finder's fee. Second, even if there was consideration, the Letter Agreement only requires payment "when, as and if you ever completely divest yourself of all your stock interest in the Browns. . . ." Defendant still holds one percent of the stock in the team. In addressing these arguments, the *Minogue I* court recognized legitimate arguments that the finder's fee was compensation for future services and that the retained one percent interest does not qualify as a "stock interest." *Minogue I*, 384 F.Supp.2d at 825. Nonetheless, the fact that Plaintiffs' claims are not meritless does not equate to a likelihood of success on the merits. *Compare id.* (finding a genuine issues of material fact on both issues), *with Leary*, 228 F.3d at 739 ("[T]he proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion.").

The *Minogue I* court also found Plaintiffs' prevention arguments unavailing. *Minogue I*, 384 F.Supp.2d at 826. Prevention arguably doesn't apply when the contract authorizes a party to

---

[2] Defendant has cited law for the proposition that assets of the estate are released to the legatee by operation of law once all claims against the estate are paid *or* by actions of the executor. Mrs. Andrews is both the sole legatee and the executor. Defendant has not made any argument that the document identified in Exhibit 8 to Plaintiffs' Complaint is not a legally sufficient action by the executor.

11

prevent a condition from happening.  Here, Defendant has no obligation under the Letter Agreement to ever sell all of his stock.  *Id*.  Similarly, Defendant's apparently absolute discretion also prevents Plaintiffs from meeting their burden on the good faith and fair dealing claim.

Even if Plaintiffs could prove an obligation, their constructive trust or equitable lien claim is based on the "implicit inten[tion] that Modell's stock interest in the Cleveland Browns and any proceeds received by Modell as a consequence of its partial or complete sale would serve as a security for the payment of the finder's fee obligation."  (Comp. ¶ 99).  Plaintiffs support this allegation with the testimony of Defendant's expert McCreary that at the time of the purchase the NFL would not have allowed "corporations to own stock in any corporation owning a franchise."  (Kho Decl. Ex. A at 246:19-247:4).  However, the form of ownership in a franchise and the way that Defendant disposed of his stock appear to be unrelated issues.  Indeed, the Letter Agreement weighs against a finding that the parties intended a security interest in the stock or its proceeds:

> [W]hen, as and if you ever completely divest yourself of all your stock interest in the Browns or the Browns completely liquidate, you shall pay me *an amount equivalent to* 5% of your net gain from either of those transactions and any intervening sales by you of your Browns stock.

(Comp. Ex. 15) (emphasis added).

Moreover, Plaintiffs' allegations of unjust enrichment do not support a preliminary injunction under an equitable lien theory.  Plaintiffs can only succeed on this theory if there is an injustice in Defendant keeping the proceeds from the sale of a franchise that he owned stock in for over 40 years.  If the contract allows Defendant to maintain a 1% interest, or if there is no obligation due to a lack of consideration, there is nothing unjust about Defendant maintaining control over the proceeds from the sale.  The Court has already decided that Plaintiffs have failed

to meet their burden on these threshold issues.

Accordingly, the Court concludes that Plaintiffs have not met their burden of proving a likelihood of success on the merits.

The next factor is whether the movant would suffer irreparable injury without the injunction.  It will always be advantageous for a litigant to secure the full amount of his claim prior to obtaining judgment, both as financial reassurance and as a strategic weapon in litigation.  The failure to do so does not automatically rise to the level of irreparable harm.  Here, Plaintiffs claim that Defendant is attempting to liquidate his assets in order to make himself judgment proof.  Plaintiffs filed a similar preliminary injunction motion in *Minogue I.*  It is notable that despite the pressing urgency they now profess, Plaintiffs waited nearly six months after *Minogue I* to file the present Complaint and Motion.  Moreover, they have represented to the Court that the majority of discovery was completed as part of *Minogue I.*  Assuming that this is true, this case should be ripe for a final adjudication in relatively short order.  Finally, Plaintiffs argue that Defendant will not be harmed in light of his substantial wealth.  Of course, the more wealth that is in the hands of Defendant, the less urgent are Plaintiffs' claims of irreparable harm.  In any event, the value of Defendant's assets is entirely unclear, beyond the fact that he recently sold his share of BRLP for millions more than the amount he is alleged to owe to the Trust.  The mere fact that he is engaged in estate planning activities does not mean that he is or will be judgment proof.  Based on the record before the Court, there is little evidence that Defendant will divest all of his assets during the pendency of this litigation, or that if he does, those assets will not be accessible.  Any injury to Plaintiffs is speculative at best.

It is also understandable that Defendant does not wish to tie up $21.5 million dollars for

an indeterminate time at the discretion of the Court and an adverse litigant. This brings to bear the third factor: whether issuance of the injunction would cause substantial harm to others. Assuming for the sake of argument that his assets are near or below $21.5 million—the only situation in which Plaintiffs would have a colorable argument of irreparable harm—Defendant would also be harmed by such an injunction.

The final factor is whether the public interest would be served by issuance of the injunction. This is a dispute over money between private litigants. Although Plaintiffs allege that there is a public interest in having contracts enforced, this assumes that there is a contractual obligation in the first place. Here, that assumption is arguable. Moreover, there are substantial arguments against granting a prejudgment asset-freezing injunction. Such injunctions are allowed in England and have been referred to as the "nuclear weapon of the law" for general creditors. *Grupo Mexicano*, 527 U.S. at 329. The Court is wary of granting such an injunction merely because what is essentially a contract claim can also be artfully stated as an equitable claim.

In sum, Plaintiffs simply have not made a clear showing that any one of the four factors is met, let alone that the balance of the four factors favors a preliminary injunction. Accordingly, their motion for a preliminary injunction is denied.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion for a Preliminary Injunction is DENIED.

IT IS SO ORDERED.

                                            /s/ Patricia A. Gaughan
                                            PATRICIA A. GAUGHAN
                                            United States District Judge

Dated: 3/14/06